Filed 7/27/22  P. v. McDow CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JERMAINE DANTE MCDOW,<br><br>Defendant and Appellant. | F080622<br><br>(Kern Super. Ct. No. MF013071A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

John P. Dwyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

In the summer of 2018, defendant Jermaine Dante McDow became friendly with G.D., a 13-year-old boy.[1]  G.D. later alleged defendant sexually abused him during this time.  On November 6, 2019, a jury convicted defendant of lewd and lascivious acts with G.D., a child under the age of 14, with force, during the first incident (Pen. Code, § 288, subd. (b)(1),[2] count 1); lewd and lascivious acts with G.D., a child under the age of 14, during the first incident (*id.*, subd. (a), count 2); lewd and lascivious acts with G.D., a child under the age of 14, with force, during the second incident (*id.*, subd. (b)(1), count 3); lewd and lascivious acts with G.D., a child under the age of 14, during the second incident (*id.*, subd. (a), count 4); lewd and lascivious acts with G.D., a child under the age of 14, during the third incident (*ibid.*, count 5); inducing G.D., a minor, to use marijuana between May 1 and June 15, 2018 (Health & Saf. Code § 11361, count 6); and inducing G.D., a minor, to use marijuana between June 26 and July 31, 2018 (Health & Saf. Code, § 11361, count 7).  As to counts 1 through 4, the jury found not true that defendant used a dangerous or deadly weapon or firearm during the commission of the underlying offenses (§ 667.61, subd. (e)(3)).  As to count 5, the jury found true that defendant committed first degree burglary with the intent to commit lewd and lascivious acts on G.D. (*id.,* subd. (d)(4)).  The trial court subsequently sentenced defendant to a total term of 25 years to life, plus a consecutive 20-year term.  As to counts 2 and 4, the trial court stayed punishment pursuant to section 654.

On appeal, defendant contends his convictions on counts 1 and 3 must be reversed because trial counsel was ineffective for failing to object to evidence of a specific instance of defendant's prior violent conduct, which evidence was prohibited by Evidence Code, section 1101.  Further, defendant contends he was improperly convicted

---

[1] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials.  No disrespect is intended.

[2] All further references are to the Penal Code unless specifically stated.

of both greater (§ 288, subd. (b), counts 1 & 3) and lesser included (*id.*, subd. (a), counts 2 & 4) offenses because his conviction as to counts 1 and 2 and counts 3 and 4 involve the same conduct. Respondent concedes defendant's convictions on counts 2 and 4 must be reversed because they are both lesser included offenses of counts 1 and 3.

We accept respondent's concession and reverse the convictions on counts 2 and 4. In all other respects, we affirm.

## FACTS

During the summer of 2018, defendant and G.D. began spending a lot of time together. During this time, defendant sexually assaulted G.D. on three separate occasions. A sexual assault investigation was initiated after G.D.'s mother (Carla S.) found multiple text messages between defendant and G.D.

**I.      People's-Case-In-Chief**

**A.      *G.D.'s Testimony***

G.D. was born in 2004 and was 15 years old at the time of trial. Throughout the summer of 2018, when G.D. was 13 years old, G.D. and defendant would see each other a least three times a week. Prior to that, defendant had been a friend of G.D.'s parents and would spend time at G.D.'s house. G.D.'s parents were unaware G.D. was spending time with defendant. Defendant would pick G.D. up from his house, and they would either clean fish tanks at a barber shop or do gardening work. Over time, G.D. and defendant became friends and would talk about fish tanks and remote control cars.

In May 2018, defendant and G.D. began having conversations about alcohol, drugs, and sex. Defendant told G.D. he was bisexual and did sexual things with other men. These conversations occurred in person and over the phone. G.D. told defendant he like to vape, so defendant got him a vape pen because G.D. was not old enough to purchase one.

3.

### 1. The First Incident (Counts 1 & 2)

At or around May 2018,[3] defendant picked G.D. up in his car and drove over to a supply store and parked the car in a dirt spot. Not a lot of cars drove by the supply store. Defendant called this spot his "special location." Defendant pulled up to the spot and told G.D. he would do sexual things with others at this location. This made G.D. feel "[w]eirded out." Prior to this incident, defendant had attempted to use sex toys and have sex with G.D., but G.D. would not allow it. While sitting in the car, defendant and G.D. smoked marijuana.

At the supply store, defendant laid the back seats down, placed a blanket on the seats, and told G.D. to get in the back seat with him. Defendant then grabbed a loaded black handgun from his backpack and told G.D. if he did not comply, he would kill both him and his family. At this point, both defendant and G.D. went into the back seat and defendant put the gun away. Defendant then sat to the right of G.D. and took off his own clothes. Defendant pulled down his pants and masturbated. Additionally, defendant grabbed a sex toy from his backpack and "put[] it in his butt." Defendant then pulled down G.D.'s pants and tried to orally copulate him, but G.D. pushed him away with all his power. Defendant told G.D. he wanted to do sexual things with him. Defendant then grabbed a sex toy from his backpack. Defendant attempted to get G.D. to ejaculate by moving the toy on him up and down. Eventually, defendant drove away, and he dropped G.D. off at his house. G.D.'s parents were home, but G.D. did not tell them what had happened, but rather just went inside the house and lay down.

---

[3] Officer J. Vielma testified that he believed the first incident occurred in May 2018. G.D. testified that he told Vielma the first incident occurred in either May or June.

4.

## 2. The Second Incident (Counts 3 & 4)[4]

G.D. testified the second incident occurred at Anna's house. However, G.D. could only remember this incident occurred during the summer.

G.D. would stay at Anna's house and had his own separate room. Anna lived about 15 minutes away from defendant's house. On the night of the incident, G.D. closed his bedroom door, but left his window open because it was hot inside the room. Between 10:30 p.m. to 11:30 p.m., defendant slid open the window and entered G.D.'s room. Defendant knew G.D. was staying at Anna's house because G.D. had told him over video chat he was staying at the house. Defendant had hard cider and wine coolers in his hand. G.D. asked defendant, "Why are you here?" but defendant did not respond. At this point, G.D. and defendant drank the alcohol and smoked marijuana. They drank for one to two hours and consumed three wine coolers and three hard cider beverages. Sometime during the night, defendant slipped a door stop underneath the bedroom door to prevent it from being opened.

While drinking alcohol, defendant played a pornographic VHS tape on the television. Defendant also obtained Anna's WIFI password and searched for pornography on his laptop. Defendant sat on the bed next to G.D., masturbated for about five minutes, and tried to convince G.D. to do so also, but G.D. refused. G.D. then saw the same sex toy and a black handgun in defendant's backpack. Defendant and G.D. never left the bedroom and defendant urinated in a bottle. Defendant then video chatted with G.D.'s friend, N.S., over the phone. During this incident, defendant rubbed his hand against G.D.'s stomach over the clothes after G.D. became intoxicated.

---

[4] G.D. testified the "second incident" occurred at his grandmother's (Anna K.) house. However, Officer Vielma testified G.D. told him during his interview the "second incident" occurred in June 2018 at the same location as the "first incident."

### 3. The Third Incident (Count 5)

The third incident occurred at Anna's house. Defendant arrived at the house with marijuana, cigars, and alcohol, where G.D. was staying.

During this incident, defendant video chatted with N.S. and had the phone camera pointed towards his penis while masturbating. Defendant tried to convince N.S. to show him his penis and N.S. began to masturbate. After defendant ejaculated and cleaned himself, he pulled out the same sex toy and placed it on the nightstand. Defendant then grabbed G.D.'s penis on the outside of his pants and tried to force G.D. to use the sex toy for about five to 10 minutes. During this time, defendant told G.D., " 'Come on. It feels good.' " Defendant then touched G.D.'s penis with his hand over the clothes, but G.D. pushed it away and told defendant to stop. G.D. was high and had consumed alcohol. G.D. then observed the handgun in defendant's backpack and defendant again told him if he did not comply, he would hurt his family. Later, defendant talked to G.D. about making G.D. a smaller version of the sex toy. Eventually, defendant made him a toy, but he never gave it to G.D.

### 4. Additional Conduct

Defendant and G.D. would video chat once or twice a day. During one of these chats, defendant showed G.D. his penis. On one occasion, defendant asked G.D. to show him his penis, but G.D. never did.

G.D. stopped seeing defendant after Carla found out they were talking about buying marijuana and vaping over text message. G.D. then told Carla about what had been going on sexually between him and defendant. Thereafter, law enforcement became involved.

### B. *N.S.'s Testimony*

N.S. was born in 2004 and was 15 years old at the time of trial. In middle school, N.S. and G.D. were friends. On the date of trial, the two of them no longer talked. During the summer of 2018, N.S. hung out with defendant five to 10 times. N.S. met

defendant in eighth grade through G.D, and G.D. was present each time N.S. and defendant hung out. N.S. also talked with defendant over the phone and through text message and Facebook Messenger. Sixty percent of the conversations between N.S. and defendant were sexual in nature. Defendant, through text message and Facebook Messenger, asked N.S. to send him pictures of N.S. in his boxers and to show defendant his penis through video chat. Additionally, on one to two occasions, defendant sent N.S. pictures of himself in his boxers or underwear, along with a picture of his penis. Defendant talked with N.S. about sexual practices, anatomy, and pornography. He also showed N.S. pornography through video chat and in person and talked about sex toys, specifically the same object he had shown to G.D. Defendant told N.S. he would buy him and G.D. that toy and that he was going to make G.D. his own toy. Defendant mentioned to N.S. that he exchanged photographs of penises with other people and referenced a particular pornographic site. He referred to N.S. as either a "nasty boy" or "dirty boy."

Defendant also talked with N.S. about buying and smoking marijuana. N.S. met with defendant two to three times to smoke marijuana and bought marijuana from defendant one time. Defendant also gave N.S. vaping supplies, such as vape juice and vape mods. N.S., G.D., and defendant would smoke marijuana at G.D.'s house when his parents were away. Defendant would be the only adult at the house.

During one incident, N.S. testified that he video chatted with G.D. and defendant at Anna's house. N.S. saw defendant and G.D. lying on their backs in bed with their penises exposed. N.S. observed defendant and G.D. watching pornography on a laptop and masturbating. Defendant wanted N.S. to masturbate with them and asked N.S. about the size of his penis. Defendant and G.D. told N.S. they were drinking hard cider and smoking marijuana. Defendant also spoke about how he snuck into G.D.'s room through the window.

Later on, defendant told N.S. to erase text conversations between the two of them so his parents would not find out they were communicating. Defendant also talked with N.S. about how G.D. became comfortable showing his penis to defendant. N.S. stopped talking with defendant after Carla searched G.D.'s phone and discovered G.D. and defendant were communicating.

### C.    *G.D.'s Statements to Officer Vielma*

Officer Vielma interviewed G.D. on two separate occasions. Carla was present during the first interview. In the first interview, G.D. described different instances where defendant sexually assaulted him. The next day, during the second interview, G.D. described three separate incidents of sexual assault. G.D. often had difficulty understanding Officer Vielma's questions and Officer Vielma had to talk as if G.D. was much younger. However, Officer Vielma was able to determine there were at least three separate incidents of sexual assault and identified time frames for each of those incidents.

Officer Vielma determined the first incident happened in May 2018. G.D. told Officer Vielma the first incident occurred after defendant had taken him to clean a fish tank at a barber shop. Afterward, defendant took G.D. to a secluded, vacant lot. Defendant called it his "special spot." At this location, they smoked marijuana. Defendant then adjusted the rear seats to lay flat and displayed a firearm, while threatening and ordering G.D. into the backseat. While in the backseat, defendant masturbated with a sex toy until he ejaculated. Defendant asked G.D. if he wanted to perform an act of oral copulation. Defendant then used both of his hands to try and pull G.D.'s pants down and leaned over to G.D.'s penis; G.D. was able to push defendant away. Defendant then used the sex toy on G.D. and G.D. was unable to stop defendant. Eventually, defendant stopped using the device and G.D. was able to pull up his shorts and underwear and went back to the front passenger seat.

G.D. told Officer Vielma the second incident happened in June 2018. G.D. stated the incident happened after defendant had taken him to get a haircut at the barber shop.

During this incident, defendant again removed the black handgun from his backpack, ordered G.D. to the backseat, and reminded him about what would happen if he did not comply. Defendant adjusted his rear seats to lay flat and removed all his clothing. G.D. noticed defendant's penis was already erect. Defendant then took out multiple sex toys from his backpack, including one toy used in the first incident. Defendant then used a sex toy on himself for about five to 10 minutes. Defendant, while using the device, looked at G.D. and masturbated. Defendant then asked G.D. if he wanted to perform an act of oral copulation. G.D. told him no and defendant grabbed the back of G.D.'s head with both hands and forced his face towards defendant's penis; G.D. was eventually able to break free. Defendant then used both hands to pull down G.D.'s shorts to his knees and leaned over towards G.D.'s penis. He then tried to use the sex toy on G.D. and used it on him for approximately 10 minutes. Once defendant stopped, G.D. put his pants back on and went back to the front passenger seat.

G.D. told Officer Vielma the third incident happened in July 2018 at Anna's house. During this incident, defendant showed up with marijuana, and video pornography. They proceeded to drink the alcohol and smoke the marijuana. They contacted N.S. while under the influence of both the alcohol and marijuana. G.D. then observed defendant ejaculate onto a washcloth while lying next to him in the bed. G.D. believed some of the semen landed on the bedsheets. Defendant then laid on top of G.D. and attempted to orally copulate him. Defendant grabbed the back of G.D.'s head and pulled his head towards defendant's penis. He then reached into G.D.'s shorts and attempted to stroke his penis.

### D. *Further Law Enforcement Investigation*

Immediately after the second interview, Officer Vielma went to Anna's residence and collected evidence. Officers searched G.D.'s room and processed the bedsheets. Semen stains were found on the sheets. J. Garza, a DNA analyst with the Kern Regional Crime Lab, testified that he was confident there was a match between defendant's DNA

and the DNA from the epithelial cell fraction and sperm cell fractions from both stains found on the sheets. Moreover, officers confirmed G.D.'s room door did not have a lock. Anna testified when she went into the G.D.'s room she was unable to open the door because there was a door stopper in the way. Officers also located plastic lemonade containers, one of which contained urine. They also located and processed defendant's left ring and left index fingerprints on the exterior window.

Additionally, officers searched defendant's room at his parent's house. In the bedroom, officers located a briefcase with towels inside. Officers also found pornography magazines in defendant's closet. They also found a backpack behind his bedroom door and inside was the WIFI password to Anna's house. Officers also located VHS pornography tapes, lubrication, various sex toys, and marijuana paraphernalia.

## II. Defense Case-In-Chief

Detective Michael Adams interviewed G.D. who stated there were three separate incidents of sexual assault. G.D. stated two of those incidents took place in the car at the special spot. G.D. stated only one of the incidents took place at Anna's house.

Deputy Andrew Chaidez of the Kern County Sheriff's Department testified he contacted both G.D. and Carla in July 2018. G.D. told Deputy Chaidez that during one incident defendant and G.D. went to get food and then went back to defendant's house. While inside a car at defendant's house, defendant tried to grab G.D.'s penis. G.D. stated he never smoked marijuana with defendant and defendant never saw G.D.'s penis. During the interview, G.D. only mentioned the one incident where defendant touched him while inside the car at defendant's house.

Stephanie M., defendant's mother, testified she never saw defendant with a gun, nor were there ever any guns inside the house. She testified defendant was neither violent nor aggressive, but rather "very friendly." She also testified G.D. went to her house in July 2018 and asked whether defendant could give him a ride home. Stephanie observed G.D. to be "high on weed," and he proceeded to sit on the chair on the porch for

20 minutes. Stephanie eventually woke up defendant and defendant drove G.D. home. On cross examination, Stephanie acknowledged she was aware defendant had sex toys inside his bedroom.

## III. Prosecution Rebuttal

On rebuttal, the People called G.D.'s little brother, G. G. was 12 years old at the time of trial and testified that defendant threatened him on one occasion with a black pocketknife if he refused to smoke marijuana or vape. This incident occurred inside the garage of G.'s house in late summer of 2018. G. testified that defendant held the knife "low and he did it real quick." G. eventually smoked marijuana with defendant. G. subsequently told Officer Vielma about the incident. On cross examination, G. testified that defendant and G.D. appeared to be friendly while hanging out inside the garage. Moreover, G. acknowledged that during the incident the knife was closed, and he never saw the blade.

## IV. Defense Surrebuttal

Officer Vielma testified G. told him defendant threatened to stab G. with the knife if he told anyone that defendant was at the house smoking marijuana. However, G. was unable to describe the knife during the interview.

## DISCUSSION

## I. Ineffective Assistance of Counsel

Defendant contends counts 1 and 3 must be reversed because trial counsel was ineffective for failing to object to G.'s testimony regarding defendant's threat with a knife. Defendant contends the testimony constituted improper evidence of a specific instance of misconduct offered to prove defendant's character, which is prohibited by Evidence Code section 1101, subdivision (a). Defendant further argues there was a reasonable probability of a different outcome at trial had trial counsel objected and moved to exclude this evidence.

11.

We agree G's testimony regarding the threat with the knife was improper evidence of a specific act and that such evidence was prohibited by Evidence Code section 1101, subdivision (a). However, as we explain, we cannot conclude trial counsel's performance was objectively unreasonable because there are plausible tactical reasons for not objecting to this evidence. Additionally, even if trial counsel's performance was deficient, defendant is unable to establish a reasonable probability of a different outcome at trial had trial counsel objected and moved to exclude G.'s testimony.

## A.    *Additional Factual Background*

The relevant exchange between the prosecutor, trial counsel, and the trial court preceding G.'s testimony is as follows:

> "The Court:   You also said something about aggressive nature.
>
> "[Prosecutor], please.
>
> "[Prosecutor]:    That's correct, Your Honor.  The People will be calling a witness, given that [Stephanie] testified that the defendant is not violent or aggressive.  The People have provided discovery of an interview that took place with the victim's younger brother, [G.], where the defendant pulled a knife on him and threatened him.
>
> "The People will be needing to get in touch with [G.] to have him brought to court in order to testify as to that experience, given that now [Stephanie] has testified the defendant is a non - - nonviolent or not aggressive person.
>
> "[¶] . . . [¶]
>
> "The Court:   All right.  And then had - - [Stephanie] did testify, [trial counsel], her son is not violent or aggressive character.  Is friendly, not violent or aggressive.
>
> "I'll hear your comments about that.
>
> "[The prosecutor] wanted to bring in the younger brother [G.].
>
> "[Trial Counsel]:    Your honor, if they have a witness that will say otherwise, we'll have to deal with that on cross-examination.

12.

"[¶] . . . [¶]

"The Court:   All right.  Clearly, I think that [Stephanie's] character testimony regarding her son being nonaggressive and nonviolent would allow the People to call a witness who can say otherwise, and that would apparently be the victim's brother [G.].  That a knife was pulled on him and threatened.  That witness will be allowed as a rebuttal witness, if you can find him and bring him in, [prosecutor].

"[Prosecutor]:   Uh-huh."

## B.    *Standard of Review*

Defendant has the burden of proving ineffective assistance of counsel.  (*People v. Pope* (1979) 23 Cal.3d 412, 425, overruled on other grounds in *People v. Berryman* (1993) 6 Cal.4th 1048.)  To establish such a claim, a defendant must show (1) his counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's error, a different result would have been reasonably probable.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  (*Strickland*, at p. 694.)

"Because of the difficulties inherent in making the evaluation [of counsel's performance], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, the challenged action 'might be considered sound trial strategy.' "  (*Strickland*, *supra*, 466 U.S. at p. 689.)  "When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation."  (*People v. Anderson* (2001) 25 Cal.4th 543, 569.)  Reversal is permitted " 'only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' "  (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.)

"A claim of ineffective assistance based upon a failure to object to inadmissible evidence will not usually succeed on direct appeal." (*People v. Clotfelter* (2021) 65 Cal.App.5th 30, 55.) "Whether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence." (*People v. Hayes* (1990) 52 Cal.3d 577, 621.) "In light of the deferential standard, appellate courts do not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight and, for this reason, tactical errors do not generally provide a basis for reversing a conviction." (*People v. Clotfelter*, at p. 55, accord, *People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

## C.    *Applicable Law*

The prosecution is generally prohibited from presenting evidence of a defendant's bad character to prove the defendant acted in conformity with that character in committing the underlying offense. (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 357 (*Tuggles*); Evid. Code, § 1101, subd. (a).) However, a defendant may present opinion or reputation evidence to show the defendant's character is inconsistent with a character trait associated with the charged offense, and therefore the defendant did not likely commit the offense. (*People v. Wagner* (1975) 13 Cal.3d 612, 617 (*Wagner*); *Tuggles*, at p. 357; Evid. Code, § 1102, subd. (a).)

When a defendant presents good character evidence, the prosecutor may then present opinion or reputation evidence of the defendant's bad character to rebut the defendant's evidence and show a likelihood of guilt. (*Tuggles*, *supra*, 179 Cal.App.4th at p. 357; Evid. Code, § 1102, subd. (b).) However, Evidence Code section 1102 does not allow either party to admit into evidence specific instances of conduct to prove the defendant acted in accordance with his or her character trait. "As the Law Revision Commission's comments to [Evidence Code] section 1102 make clear, evidence of specific acts of the accused are, as a general rule, inadmissible to prove his [or her]

14.

disposition to commit such acts (see also Evid. Code, § 1101); the general rule is applicable 'even though the defendant has opened the question by introducing evidence of his [or her] good character.' " (*Wagner*, *supra*, 13 Cal.3d at p. 619.)

As it relates to rebuttal, "[r]ebuttal evidence is relevant and thus admissible if it 'tend[s] to disprove a fact of consequence on which the defendant has introduced evidence.' [Citation.] The trial court is vested with broad discretion in determining the admissibility of evidence in rebuttal." (*People v. Clark* (2011) 52 Cal.4th 856, 936.) Pursuant to Evidence Code, section 1101, subdivision (c), "Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

### D. *Analysis*

#### 1. G.'s Testimony

Here, G.'s testimony regarding defendant threatening him with a knife was inadmissible evidence of a specific instance of conduct. (*Wagner*, *supra*, 13 Cal.3d at p. 619.) After Stephanie testified that defendant was neither violent nor aggressive, but rather "very friendly," the People could have introduced evidence of defendant's character for violence through either opinion or reputation evidence. (Evid. Code, § 1102, subd. (b).) However, the People were not permitted to introduce a specific instance of violent conduct to rebut Stephanie's testimony, which in this case was defendant's threat towards G. with a knife. (See *People v. Felix* (1999) 70 Cal.App.4th 426, 431.) Therefore, pursuant to Evidence Code, sections 1101 and 1102, G.'s testimony was inadmissible character evidence of a specific instance of conduct.

Respondent contends the evidence was not offered to prove defendant had a propensity for violence, but rather to impeach Stephanie's testimony she had never known defendant to be violent or aggressive. However, G.'s testimony did not suggest Stephanie was aware defendant had engaged in prior violent acts, and thus it did not impeach the credibility of her opinion testimony. Rather, the record is clear the People introduced G's testimony to rebut Stephanie's opinion defendant was not violent or

15.

aggressive and show defendant's propensity towards violence. Specifically, the prosecutor stated, "The People will be calling a witness [G.], given that this witness testified that the defendant is not violent or aggressive" to testify "the defendant pulled a knife on [G.] and threatened him." Moreover, the trial court in its decision stated, "I think that [Stephanie's] *character* testimony regarding her son being nonaggressive and nonviolent would allow the People to call a witness who can say otherwise, and that would apparently be the victim's brother [G.]. That a knife was pulled on him and threatened. That witness will be allowed as a rebuttal witness." (Italics added.) The prosecutor responded, "Uh-huh."

The trial court clearly understood the purpose of the evidence was not to impeach Stephanie's testimony, but rather to establish defendant's character for violence and the People, in turn, agreed with the trial court's understanding of the purpose of G.'s testimony. Moreover, during the People's closing rebuttal, the prosecutor argued, "The defendant's mom gets up there and says, 'Oh, he's not a violent guy' … and we can put [G.] on to say, 'Hey, yeah, he is violent because he threatened me with a knife as well.' " Additionally, the jury was instructed as to G.'s testimony that although "[y]ou have heard character testimony that the defendant is a non-violent person [¶], evidence of the defendant's good character may be countered by evidence of (his[]) bad character for the same trait." G.'s testimony was not admitted for impeachment purposes, but rather to show defendant's propensity for violence.

### 2. Trial Counsel Had a Tactical Purpose for Not Objecting to G.'s Testimony

Here, as noted above, G's testimony was inadmissible character evidence of a specific instance of conduct. (Evid. Code, §§ 1101, subd. (a), 1102, subd. (b).) Therefore, we must determine whether trial counsel's failure to object to this evidence constituted ineffective assistance of counsel. Applying *Strickland's* two-part test for analyzing these types of claims, defendant's argument fails on both prongs.

16.

Although G.'s testimony was inadmissible, trial counsel's performance was not deficient because there are plausible tactical reasons for not objecting to this rebuttal testimony. (See *People v. Hayes*, *supra*, 52 Cal.3d at p. 621.) Trial counsel stated his intent to "deal with" G.'s testimony on cross examination. During cross-examination, G. testified he never saw the blade because the knife was closed, and he could not describe the knife to Officer Vielma. Additionally, trial counsel's primary defense centered around G.D.'s credibility as a witness. During closing argument, trial counsel argued G.D. lied about multiple things surrounding this case and therefore the jury should not believe him. As it related to G.'s testimony, trial counsel argued G. had an incentive to lie because G.D. is his older brother. Specifically, trial counsel stated, "But [G.] does have a reason to lie. He lives in that house. [G.D.'s] his brother. They've had a lot of time to talk about the case." During defense's surrebuttal, G.'s credibility was put into question when he was unable to describe the knife in his interview with Officer Vielma. Overall, G.'s testimony fits into the defense's theory that both G.D. and G. talked about this case before trial and then proceeded to lie about the alleged conduct. Therefore, because the People's case depended primarily on G.D.'s testimony, it was reasonable for trial counsel to attack G.D.'s credibility as a witness, which included attacking G.'s credibility as well. Trial counsel chose to attack G.'s credibility through cross examination, rather than seeking to exclude the testimony. On this record, we cannot say that trial counsel acted deficiently in not objecting and allowing G. to testify. However, even assuming trial counsel was ineffective, defendant was not prejudiced. First, G.'s testimony regarding the knife and threat was brief and was effectively impeached. Further, it was clarified on cross-examination the knife was closed and G. never saw the blade during the incident. Moreover, during surrebuttal, Officer Vielma testified G. was unable to describe the knife during his initial interview.

Second, the evidence of defendant's guilt was substantial. As to count 1 (§ 288, subd. (b)(1)) and count 2 (*id.*, subd. (a)), G.D. testified defendant picked him up in his car

and drove him to a secluded parking lot next to a supply store. While there, G.D. testified defendant pulled out a firearm and threatened his life and his family's life if he did not get into the backseat and comply with his demands. In the backseat, defendant reached into his backpack, grabbed a sex toy and proceeded to use it on G.D. and get G.D. to ejaculate. G.D. then testified defendant pulled down his pants, got in front of G.D., and tried to orally copulate him, but G.D. was able to push him away with all his power. (See *People v. Alvarez* (2009) 178 Cal.App.4th 999, 1005 ["According to the majority of courts, [force] includes acts of grabbing, holding, and restraining that occur in conjunction with the lewd acts themselves"].)

As to count 3 (§ 288, subd. (b)(1)) and count 4 (*id.*, subd. (a)), although there were discrepancies as to where this incident occurred,[5] G.D. did tell Officer Vielma defendant removed a firearm from his backpack and reminded him of what could happen if he did not comply. G.D. also stated defendant asked him if he would orally copulate him, but G.D. said no. At this point, defendant grabbed the back of G.D.'s head with both hands and forced G.D.'s face toward defendant's penis, but G.D. was able to break free. Defendant then began to use the sex toy on G.D. for approximately 10 minutes. Overall, the jury could have believed G.D.'s statement to Officer Vielma was a correct recollection of the alleged incident, rather than his trial testimony. Accordingly, even if G.'s testimony was excluded, a different result was not reasonably probable.

Nonetheless, defendant contends that because of G.D.'s credibility issues, one juror may have been swayed to guilt because of G's testimony regarding the knife. Specifically, defendant argues that other than G.'s testimony, there was little evidence defendant used "force" against G.D. As it specifically relates to the gun, although the jury was not convinced beyond a reasonable doubt defendant used a firearm during the

---

[5] As noted above, G.D. testified the "second incident" happened at Anna's house, whereas Officer Vielma testified G.D. told him during his second interview the incident happened at the same place as the "first incident."

commission of the offenses alleged in counts 1 through 4, the jury may have still believed G.D.'s testimony defendant either used force or threatened him and his family if he did not comply with his demands. (§ 288, subd. (b)(1); see also *People v. Santamaria* (1994) 8 Cal.4th 903, 922 ["These cases confirm that the jury's not true finding on the enhancement allegation does not mean defendant did not use the [weapon], only that there was a reasonable doubt that he did"].) Moreover, although there were inconsistencies throughout G.D.'s testimony, it was for the jury to determine the weight given to his testimony. (*People v. Carlson* (1946) 73 Cal.App.2d 933, 940 [Holding that in a lewd and lascivious conduct case, it was for "the jury [to] determine[e] the weight to be given to [the] testimony. [Citation.] Even testimony which is subject to justifiable suspicion does not justify a reversal of judgment, for it is the exclusive province of the jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends"].) Lastly, the prosecutor did not "exploit[] the inadmissible evidence" during her rebuttal argument. As discussed above, trial counsel made a tactical decision in declining to object to G.'s testimony. Trial counsel utilized G.'s testimony as a means to argue both G. and G.D. were not credible witnesses. In rebuttal, the People permissibly referenced G.'s testimony to argue in support of both G.'s and G.D.'s credibility. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1331 [A "prosecutor could fairly rely on them in closing argument, for prosecutors are given wide latitude during closing argument and may urge the jury to draw any reasonable inference from the evidence"].)

## II. The Lesser Included Offenses (Counts 2 and 4)

Defendant further contends he was improperly convicted of both the greater (§ 288, subd. (b), counts 1 & 3) and lesser included offenses (*id.*, subd. (a), counts 2 & 4) relating to both the first and second incident. Defendant argues his conviction as to both counts 1 and 2 and counts 3 and 4 involve the same conduct. Respondent concedes error.

19.

We accept respondent's concession and reverse defendant's convictions as to count 2 (*ibid.*) and count 4 (*ibid.*).

A "lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117.) "[M]ultiple convictions may not be based on necessarily included offenses. The test for necessarily included offenses is whether an offense cannot be committed without necessarily committing another offense." (*People v. Villa* (2007) 157 Cal.App.4th 1429, 1434.) "[S]ection 288, subdivision (a), is a lesser or necessarily included offense of section 288, subdivision (b)." (*People v. Ward* (1986) 188 Cal.App.3d 459, 472.)

Here, as both defendant and respondent correctly point out, counts 1 (§ 288, subd. (b)(1)) and 2 (*id.*, subd. (a)) pertained to the "first incident or incident number one" and counts 3 (*id.*, subd. (b)(1)) and 4 (*id.*, subd. (a)) pertained to "incident number two." Specifically, during closing argument the prosecutor stated the following:

> "Counts 1 and 2 deal with what was referenced as the first incident or incident number one. There are two separate crimes charged. One is child molestation with force. The second is child molestation.
>
> "You will see, as we go through the elements of these crimes, that those particular crimes, those two crimes, have exactly the same three elements, but crime number one has an additional element of force or fear.
>
> "Crimes three and four deal with incident number two. It was referenced throughout this trial and incident number two. The same situation. Child molestation with force and child molestation.
>
> "Again, the only difference in the element is that Count 3 would have the force or fear requirement. Count 4 would not."

After going through the evidence pertaining to count 1, the prosecutor stated:

> "We move on to Count 2. I'm not going to go through the details of Count 2 because, like I said, the only difference between Count 2 and

Count 1 is that Count 1 requires force. If you find the defendant guilty on Count 1, you're going to find the defendant guilty on Count 2 because it's the same three elements, minus the force.

"If you find the defendant not guilty on Count 1 because you don't find that force was used, you still have Count 2 to make a determination on to see if child molestation occurred without force."

With regard to count 3, the prosecutor stated, "As to the second incident, was there a touching on either the defendant or the victim, bare skin or through the clothing, in any way, shape, or form on their body." The prosecutor continued:

"Count 4. Again dealing with the second incident. Again the same elements of the crime. Just no force or fear. We've already gone through each of these touchings. We're not going to go through it again.

"So if you find that the defendant did use force or fear for crime number three, which is incident number two, then you find guilty as well on Count 4.

"If you don't find that the defendant used force or fear on crime number three, you can go to crime number four and still find him guilty of the child molestation without the force."

Finally, at defendant's sentencing, the trial court recognized counts 1 and 2, along with counts 3 and 4 were based on the same conduct. The trial court stated, "[A] full, separate, and consecutive term shall be imposed for each violation of an offense … if the crimes involved a separate victim or the same victim on separate occasions. [¶] [However,] [i]t would be ordered that Counts 2 and 4 be stayed, pursuant to 654, as they arise from the same set of operative facts as other counts being used to impose judgment."

Count 2 is a lesser included offense of count 1 and count 4 is a lesser included offense of count 3. (See *People v. Ward*, *supra*, 188 Cal.App.3d at p. 472.) The People argued at closing argument they were relying on the same evidence to support both counts 1 and 2, and the same evidence to support counts 3 and 4. Accordingly, count 2

21.

being a lesser included offense of count 1 is reversed and count 4 being a lesser included offense of count 3 is reversed.[6]

## DISPOSITION

For the foregoing reasons, we reverse defendant's convictions as to counts 2 and 4. As to counts 2 and 4, the $300 fine pursuant to section 290.3, subdivision (a), the $40 fee pursuant to section 1465.8, subdivision (a)(1), and the $30 operations fee pursuant to Government Code, section 70373, subdivision (a)(1) are stricken. The trial court is directed to issue an amended abstract of judgment to reflect the above referenced changes. Additionally, the trial court shall forward to all appropriate parties a certified copy of the amended abstract of judgment. In all other respects, the judgment is affirmed.


           POOCHIGIAN, ACTING P. J.

WE CONCUR:


SMITH, J.


SNAUFFER, J.

---

[6] As to counts 2 and 4, the trial court imposed a $300 fine pursuant to section 290.3, a $40 fee pursuant to section 1465.8, and a $30 operations fee pursuant to Government Code, section 70373. For both counts, the $300 fine was stayed pursuant to section 654. Each fine and fee was to be imposed for every conviction of a criminal offense. (§§ 290.3, subd. (a), 1465.8, subd. (a)(1), Gov. Code, § 70373, subd. (a)(1).) Because we are reversing defendant's convictions as to counts 2 and 4, the fines and fees as to these counts are stricken.

22.